# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
### CENTRAL DIVISION at FRANKFORT

FRANKFORT REHAB AND CARE, LLC,
VANCEBURG REHAB AND CARE, LLC,
STANFORD CARE AND REHAB, LLC,
ST. MATTHEWS CARE AND REHAB
CENTER, LLC, CLIFTON OAKS CARE
AND REHAB CENTER, LLC,
HILLCREEK REHAB AND CARE, LLC,
GREEN HILL REHAB AND CARE, LLC,
AND LYNDON WOODS CARE AND
REHAB, LLC,

      **PLAINTIFFS**

v.

MIDCAP FUNDING IV TRUST, AND
MIDCAP FINANCIAL SERVICES, LLC

**DEFENDANTS/**
**THIRD PARTY PLAINTIFFS**

v.

REDWOOD HOLDINGS, LLC, CAMELOT
LEASING, LLC, FRANKFORT
LEASING, LLC, GREEN HILL LEASING,
LLC, HILLCREEK LEASING, LLC,
KIRTLAND LEASING, LLC, MT. HOLLY
LEASING, LLC, PROVIDENCE
HEALTHCARE MANAGEMENT, INC.,
REDWOOD HEALTHCARE
MANAGEMENT, INC., ST. MATTHEW'S
LEASING, LLC, STANFORD LEASING,
LLC, VANCEBURG LEASING, LLC, ELI
M. GUNZBURG

**THIRD PARTY DEFENDANTS**

Civil Action No. 3:20-cv-00059-GFVT

Judge: Gregory F. VanTatenhove

---

## THIRD-PARTY COMPLAINT

---

COMES NOW Defendants MidCap Funding IV Trust and MidCap Financial Services, LLC (sometimes referred to herein collectively as the "MidCap Entities" or "MidCap") and through counsel submit this Third Party Complaint for indemnity, contribution and other relief, adopting the role of Third Party Plaintiffs pursuant to Federal Rule of Civil Procedure 14 and filing this action against Redwood Holdings, LLC, Camelot Leasing, LLC, Frankfort Leasing, LLC, Green Hill Leasing, LLC, Hillcreek Leasing, LLC, Kirtland Leasing, LLC, Mt. Holly Leasing, LLC, St. Matthews' Leasing, LLC, Stanford Leasing, LLC, Vanceburg Leasing, LLC, Providence Healthcare Management, Inc., Redwood Healthcare Management, Inc., and Eli M. Gunzburg, individually (collectively, the "Third Party Defendants").

## INTRODUCTION AND PURPOSE OF THIRD-PARTY ACTION

Plaintiffs have sued only Defendant MidCap in this case, but there are actually three relevant groups of entities, not two. MidCap adds that third group in this pleading, seeking indemnity, contribution, and other relief.

First, there are Plaintiffs -- a group of limited liability companies that purport to currently operate a series of long term care facilities in Kentucky (the "Facilities"). Plaintiffs operate under the trade name Exceptional Living Centers ("ELC").

Second, there are the Third Party Defendants now added. They are limited liability companies, corporations and one individual who formerly operated, managed or otherwise controlled the Facilities prior to purportedly transferring them to the Plaintiffs. These limited liability companies and corporations were known collectively as "Redwood," based on the name of their corporate parent. On or about November 1, 2019 (the "Transfer Date"), Redwood allegedly transferred operations of the Facilities to ELC.

Finally, caught between these two, are Defendants and now Third-Party Plaintiffs MidCap. MidCap Funding IV Trust is a lender that makes available revolving lines of credit to operators of skilled nursing and other long term care facilities throughout the country.  To secure those revolving lines of credit, MidCap Funding IV Trust holds, as agent and lender, perfected, first priority secured liens in the borrowers' assets.  MidCap Financial Services, LLC is the servicer for MidCap Funding IV Trust, providing the day-to-day servicing of such loans.

MidCap Funding IV Trust provided a revolving line of credit to Redwood to finance the ongoing working capital needs of the Facilities pursuant to a Credit and Security Agreement dated as of November 1, 2016 between MidCap Funding IV Trust (as successor-in-interest to MidCap Financial Trust), as agent and lender, and various of the Third Party Defendants (as amended from time to time, the "Credit Agreement").  By way of various joinders and amendments, all of the corporate Third Party Defendants were joint and several borrowers under the Credit Agreement (the "Borrower Third Party Defendants" means all Defendants aside from Defendant Gunzburg).

As pleaded herein, at the time of the purported transfer of operations from Redwood to ELC, Borrower Third Party Defendants still owed MidCap Funding IV Trust a considerable amount of money, and MidCap Funding IV Trust still held properly perfected, first priority liens on substantially all of Borrower Third Party Defendants' assets, including their deposit accounts, cash, accounts receivable, provider agreements giving rise to the accounts receivable, and all proceeds of the foregoing.

Consistent with the agreed upon terms and requirements of the Credit Agreement, Borrower Third Party Defendants, the MidCap Entities and Fifth Third Bank (the financial institution where Borrower Third Party Defendants maintained their deposit accounts) entered into industry standard Deposit Account Control Agreements (or DACAs).  These DACAs established

standing transfer instructions pursuant to which money flowing into the Borrower Third Party Defendants' deposit accounts was automatically swept on each business day to MidCap Funding IV Trust to pay down the MidCap Loan (as hereinafter defined). Per the Credit Agreement, Borrower Third Party Defendants had the ability to borrow loan funds as frequently as on a daily basis, and the automatic sweep of collections pursuant to the DACAs served as the repayment mechanism for the loan - hence, the "revolving" nature of the credit facility. Following the purported transfer of operations to Plaintiffs, money continued to flow into those deposit accounts, and they continued to be automatically swept, reducing the amount of the Borrower Third Party Defendants' debt to zero.

In its lawsuit against the MidCap Entities, ELC claims that some of the money swept to MidCap pursuant to the DACAs related to services that ELC provided following the Transfer Date. MidCap maintains that, notwithstanding that claim, MidCap Funding IV Trust is entitled to the funds because, among other things, it held properly perfected, first priority secured liens on: (a) the deposit accounts in the names of Borrower Third Party Defendants, (b) the cash in those deposit accounts, (c) the accounts receivable paid into the deposit accounts or to the order of the owners of those deposit accounts, (d) the provider agreements giving rise to the accounts receivable, and (e) all proceeds of the foregoing. MidCap never signed any agreement disclaiming its interest in funds in the relevant accounts or otherwise released its security interest in such assets.

While MidCap strenuously disputes any liability to ELC, to the extent the Court were to find that MidCap has any liability to ELC, Third Party Defendants would have the obligation to satisfy that award. This obligation stems from the Third Party Defendants' (i) clear, repeatedly stated contractual obligations to indemnify MidCap in the present circumstances, (ii) their malfeasance in diverting funds which were, pursuant to the terms of the Credit Agreement and the

various other loan documents, properly directed to the deposit accounts to be swept to MidCap to pay down Borrower Third Party Defendants' loan obligations, and (iii) violation of the terms of those various loan documents with respect to such improper diversion of funds and other obligations.

MidCap has contribution and indemnity rights against the Third Party Defendants for any amounts this Court would order MidCap to pay to ELC, as well as the right to payment of its fees, costs and expenses of this litigation. Thus, this is a classic case where adding third party defendants under Federal Rule of Civil Procedure 14 is appropriate.

## **PARTIES**

1.      Third Party Plaintiff MidCap Funding IV Trust is a statutory trust formed and existing under the laws of the State of Delaware. Midcap Funding IV Trust's principal office is in Dublin, Ireland.

2.      Third Party Plaintiff MidCap Financial Services, LLC is a Delaware Limited Liability Company with its principal office located in Bethesda, Maryland.

3.      Third Party Defendant Camelot Leasing LLC is a Kentucky Limited Liability Company that is currently inactive and not in good standing. Its principal office is 29225 Chagrin Blvd., Suite 230, Pepper Pike, OH 44122.

4.      Third Party Defendant Frankfort Leasing, LLC is a Kentucky Limited Liability Company that is currently inactive and not in good standing. Its principal office is 29225 Chagrin Blvd., Suite 230, Pepper Pike, OH 44122.

5.      Third Party Defendant Green Hill Leasing is a Kentucky Limited Liability Company that is currently inactive and not in good standing. Its principal office is 29225 Chagrin Blvd., Suite 230, Pepper Pike, OH 44122.

4844-7091-1180

6.      Third Party Defendant Hillcreek Leasing, LLC is a Kentucky Limited Liability Company that is currently inactive and not in good standing. Its principal office is 29225 Chagrin Blvd., Suite 230, Pepper Pike, OH 44122.

7.      Third Party Defendant Kirtland Leasing, LLC is an Ohio Limited Liability Company in good standing. Its registered agent is L&M Statutory Agent, LLC, 100 Main Street, #200, Chagrin Falls, OH 44022.

8.      Third Party Defendant Mt. Holly Leasing, LLC is a Kentucky Limited Liability Company that is currently inactive and not in good standing. Its principal office is listed as 29225 Chagrin Blvd., Suite 230, Pepper Pike, OH 44122.

9.      Third Party Defendant Providence Healthcare Management, Inc. is an Ohio Corporation in good standing. Its registered agent is identified as Eli Gunzburg, 29225 Chagrin Blvd., Suite 230, Cleveland, OH 44122.

10.     Third Party Defendant Redwood Healthcare Management, Inc. is an Ohio corporation in good standing.  Its registered agent is identified as L&M Statutory Agent, LLC, 100 Main Street, #200, Chagrin Falls, OH 44022.

11.     Third Party Defendant Redwood Holdings, LLC is a Kentucky Limited Liability Company that is active and in good standing. Its principal office is listed as 29225 Chagrin Blvd., Suite 230, Pepper Pike, OH 44122. Its registered agent is Marian J. Hayden Esq., 210 Washington St., Frankfort, KY 40601.

12.     Third Party Defendant St. Matthews Leasing, LLC is a Kentucky Limited Liability Company that is currently inactive and not in good standing. Its principal office is 29225 Chagrin Blvd., Suite 230, Pepper Pike, OH 44122.

13.     Third Party Defendant Stanford Leasing, LLC is a Kentucky Limited Liability Company that is currently inactive and not in good standing. Its principal office is listed as 29225 Chagrin Blvd., Suite 230, Pepper Pike, OH 44122.

14.     Third Party Defendant Vanceburg Leasing, LLC is a Kentucky Limited Liability Company that is currently inactive and not in good standing. Its principal office is listed as 29225 Chagrin Blvd., Suite 230, Pepper Pike, OH 44122.

15.     Third Party Defendant Eli Gunzburg is an Ohio citizen who resides in Cleveland, Ohio.

## JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction over this third-party complaint by virtue of its diversity jurisdiction under 28 U.S.C. §1332.  The amount in controversy exceeds $75,000, given that the amount sought by ELC against MidCap in the primary complaint exceeds $75,000, and the relief sought by MidCap of this Court is an order obligating the Third Party Defendants to pay any damages and losses sustained by MidCap as a result of the primary lawsuit or any judgment in favor of ELC in the primary lawsuit against MidCap, along with MidCap's fees and expenses.  Further, the parties to this third-party complaint are citizens of different states.

17.     Additionally, this Court would otherwise have jurisdiction over this third-party complaint notwithstanding any absence of diversity jurisdiction by virtue of the Court's supplemental jurisdiction pursuant to 28 U.S.C. §1367.

18.     There is personal jurisdiction over the Third Party Defendants in Kentucky because all of the primary events in this case, including the purported transfer of operations, the diversion of funds, operations of the Facilities and billing, all of which involved all of the Third Party Defendants, took place in Kentucky. The facilities operated and controlled by the Third Party

Defendants were all located in Kentucky, and thus, all Third Party Defendants purposefully availed themselves of doing business in this state, making the exercise of personal jurisdiction over all of the third party defendants appropriate.

19.    This Court is the appropriate venue for this dispute because a substantial part of the events giving rise to MidCap's claims against Third Party Defendants occurred in this District. Pursuant to Local Rule 8.1, upon information and belief, a substantial part of the events and omissions in this case took place within the Central Division.

### FACTUAL ALLEGATIONS

### The Credit Agreement (General Background)

20.    On November 1, 2016 Third Party Defendant Redwood Holdings, LLC, and certain of its subsidiaries and affiliates as Borrowers, and MidCap Financial Trust, as Agent and Lender, entered into the Credit Agreement.

21.    The Credit Agreement was also entered into by and on behalf of subsidiaries and affiliates of Redwood Holdings LLC, specifically Third Party Defendants St. Matthews Leasing, LLC, Hillcreek Leasing, LLC, Camelot Leasing, LLC, Mt. Holly Leasing, LLC, and Redwood Healthcare Management, Inc. as additional "Borrowers," with all the rights and obligations of Redwood Holdings LLC.

22.    MidCap Financial Trust promptly assigned its rights under the Credit Agreement and all amendments thereto to Third Party Plaintiff MidCap Funding IV Trust, as Agent and Lender.

23.    Joinder and Amendment No. 1 to the Credit and Security Agreement, executed December 1, 2016, was made between MidCap Funding IV Trust, as Agent and Lender, the existing borrowers under the Credit Agreement, and "New Borrowers," Third Party Defendants

Green Hill Leasing LLC, Frankfort Leasing, LLC, Kirtland Leasing, LLC, Vanceburg Leasing, LLC, and Providence Healthcare Management, Inc.

24.    Joinder and Amendment No. 2 to the Credit and Security Agreement, executed January 20, 2017, was made between MidCap Funding IV Trust, as Agent and Lender, the existing borrowers under the Credit Agreement, and "New Borrowers," Third Party Defendant Stanford Leasing, LLC.

25.    These amendments to the Credit Agreement did not remove any relevant obligations from the original Borrowers and vested the "New Borrowers" with the same obligations as the original borrowers.

26.    Pursuant to the terms of the Credit Agreement (as amended) and the various agreements and documents executed in connection therewith, MidCap Funding IV Trust provided a revolving line of credit in the maximum principal amount of $8,000,000 to the Borrower Third Party Defendants (the "MidCap Loan") to finance their operation of the Facilities.

**The Credit Agreement (Repayment Terms and Process)**

27.    MidCap Funding IV Trust made advances under the MidCap Loan for working capital needs of Borrower Third Party Defendants, sometimes as frequently as each business day. Those loans were advanced consistent with a borrowing formula based on the amount of accounts receivable generated by Borrower Third Party Defendants.  The Credit Agreement requires the establishment of one or more Lockbox Accounts (as defined in the Credit Agreement) subject to a Deposit Account Control Agreement (as defined in the Credit Agreement, a "DACA") or Deposit Account Restriction Agreement (as defined in the Credit Agreement, a "DARA"), as applicable, for each of the Borrower Third Party Defendants, into which payments from healthcare payors

(including specifically, government payors, such as Medicare and Medicaid, as well as commercial healthcare insurers) must be deposited.

28.     The payment of <u>all</u> collections of Accounts (as defined in the Credit Agreement to include, among other things,  **<u>any</u>** right to payment of a monetary obligation, whether or not earned by performance) (emphasis added)) required under the terms of the Credit Agreement was of critical importance given the nature of MidCap Funding IV Trust's collateral package and the process by which MidCap was to be repaid.

29.     Specifically, MidCap Funding IV Trust and Borrower Third Party Defendants agreed that all payments (other than payments made by individual patients, as opposed to payments from insurance companies or government payors) were required to be deposited into deposit accounts at Fifth Third Bank owned by a Borrower Third Party Defendant and subject to a DACA or a DARA, respectively (collectively, the "Lockbox Accounts").

30.     Moreover, pursuant to the terms of the Credit Agreement, to the extent that any collections of Accounts or proceeds of other Collateral (all assets of the Borrower Third Party Defendants, as defined in the Credit Agreement) were not sent directly to a Lockbox Account, such collections were to be held in trust for the benefit of MidCap Funding IV Trust pursuant to an express trust and immediately remitted, in the form received, to the applicable Lockbox Account and were not to be commingled with any other funds of the Borrower Third Party Defendants.

31.     Pursuant to the terms of the DACAs and DARAs, all amounts in the Lockbox Accounts were swept on a daily basis by operation of standing transfer instruction established and agreed to by the relevant Borrower Third Party Defendants to another account in the name of Third Party Defendant Redwood Holdings, LLC (the "Concentration Account").

32.    Then, pursuant to the terms of the DACA, the funds in the Concentration Account were further swept on a daily basis to an account maintained by MidCap Funding IV Trust at Wells Fargo Bank (the "MidCap Account").  All amounts deposited in the MidCap Account were promptly applied to reduce the outstanding balance of the MidCap Loan, which in turn created additional availability for Borrower Third Party Defendants to request additional advances for working capital needs and so on, and so forth.  This revolving line of credit and continuous repayment mechanism is a customary loan arrangement with many nursing home operators given the constant need for working capital, and the DACAs and DARAs are industry standard and recognized as the appropriate manner by which a lender properly secures its perfected security interest in bank accounts and the cash therein.[1]

33.    In connection with the execution of the Credit Agreement and the various amendments thereto, and consistent with its terms, between November 2016 and January 2017, MidCap Funding IV Trust (or its successor-in-interest) caused twelve (12) UCC-1 financing statements (the "MidCap UCC-1 Financing Statements") to be filed in the office of the Kentucky or Ohio Secretaries of State, as applicable, in order to properly perfect its first priority, valid, enforceable, non-avoidable lien in substantially all of the assets of the Borrower Third Party Defendants.

34.    Consistent with MidCap UCC-1 Financing Statements and the DACAs and DARAs, MidCap Funding IV Trust held a consensual, properly perfected, first priority lien on substantially all of the assets of the Borrower Third Party Defendants, including among other things, the Lockbox Accounts and the Redwood Holdings LLC Concentration Account, the cash

---

[1] The DACAs and DARAs established an authenticated record with Fifth Third Bank to comply with the daily sweep instructions to the MidCap Account (without further instruction from Borrower Third Party Defendants), which is required to establish control over all of the deposit accounts maintained by Borrower Third Party Defendants in accordance with §9-104 of the Uniform Commercial Code.

in those deposit accounts, any Borrower Third Party Defendant's right to payment of any monetary obligation, the accounts receivable payable to the Lockbox Accounts, the provider agreements giving rise to the accounts receivable, and all proceeds thereof, to secure repayment of the MidCap Loan, as well as the indebtedness of Aspenwood Holdings, LLC and related operator subsidiaries thereof to MidCap Funding IV Trust.

### The Credit Agreement (Indemnification Obligations)

35.     In addition to establishing the first priority liens on the assets and property of the Borrower Third Party Defendants, the Credit Agreement establishes crucial indemnification obligations on them as well; obligations that to date the Borrower Third Party Defendants have refused to meet.

36.     These indemnification obligations explicitly survive any payoff or termination of the MidCap Loan.

37.     The core indemnification obligation is clearly stated in Section 12.14(b) of the Credit Agreement.

38.     That provision contains the Borrower Third Party Defendants' agreement that, subject to limitations not applicable here, they will fully indemnify MidCap for every cost and loss MidCap Funding IV Trust incurs in connection with judicial proceedings connected to the Credit Agreement. Specifically, Section 12.14(b) of the Credit Agreement says that the Borrowers agree to:

> … indemnify, pay and hold harmless [among others] Agent and Lenders [MidCap Funding IV Trust]… from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind of nature whatsoever (including the fees and disbursements of counsel for [MidCap Funding IV Trust]) in connection with any investigative, response, remedial, administrative or judicial matter or proceeding … which may be imposed on, incurred by or asserted against [MidCap Funding IV Trust] as a result of or in connection with the transactions contemplated hereby or by the other Operative Documents and the use or

intended use of the proceeds of the Loans, except that Borrower shall have no obligation hereunder to [MidCap Funding IV Trust] with respect to any liability resulting from the gross negligence or willful misconduct of [MidCap Funding IV Trust], as determined by a final non-appealable judgment of a court of competent jurisdiction. To the extent that the undertaking set forth in the immediately preceding sentence may be unenforceable, Borrower shall contribute the maximum portion which it is permitted to pay and   satisfy under applicable Law to the payment and satisfaction of all such indemnified liabilities incurred by [MidCap Funding IV Trust] or any of them. (the foregoing obligations referred to herein as the "Credit Agreement Indemnification Obligations").

39.    Section 12.14(b) indisputably creates a series of broad, sweeping, and surviving obligations on the part of the Borrower Third Party Defendants to indemnify MidCap for all damages or losses, including judgments, fees, costs, and expenses associated with litigation connected to the Credit Agreement, MidCap's enforcement of the Credit Agreement, including fees and disbursements of legal counsel.

40.    The claims brought by ELC are connected to the Credit Agreement, as, among other things, ELC claims that MidCap improperly applied funds to satisfy Redwood's obligations under the Credit Agreement.

41.    Pursuant to Section 12.14(c) of the Credit Agreement, the Credit Agreement Indemnification Obligations survived the repayment of the MidCap Loan and any termination of the Credit Agreement.

42.    The Borrower Third Party Defendants' indemnification obligations have been triggered by the ELC lawsuit against MidCap, and the Borrower Third Party Defendants are liable to MidCap Funding IV Trust for all costs, fees, expenses, and judgments entered against or incurred by MidCap associated with this litigation.

### Defendant Gunzburg's Role

43.     Third Party Defendant Eli Gunzburg is the President of Third Party Defendants Redwood Healthcare Management, Inc. Providence Capital Management, Inc., and the Manager of all the limited liability company Third Party Defendants.

44.     At all relevant times, Mr. Gunzburg has served in a controlling and oversight role with respect to all of the Borrower Third Party Defendants that has given him control over all operational and financial decisions made by or for all of the Borrower Third Party Defendants.

### Gunzburg Executes the Certificate of Validity Creating Personal Obligations

45.     Defendant Gunzburg took clear, distinct steps to further guarantee Borrower Third Party Defendants compliance with certain obligations, including, without limitation, compliance with the account deposit and transfer structure established in the Credit Agreement.

46.     Most notably, on January 20, 2017, Defendant Gunzburg personally executed a Second Amended and Restated Certificate of Validity (the "Certificate of Validity").

47.     Pursuant to the terms of the Certificate of Validity, Defendant Gunzburg agreed not to take any action, or allow any action to be taken, that would impede or interfere with the deposit of all Accounts to the Lockbox Accounts.

48.     Further, Defendant Gunzburg agreed that he would not direct the diversion of any payment from any Lockbox Account in violation of the Credit Agreement and would not "take, permit, approve or suffer to occur any action that would cause any Borrower to fail to comply fully with the lockbox and cash management procedures and requirements set forth in the Credit Agreement…."

49.     In the Certificate of Validity, Mr. Gunzburg also personally committed to indemnification and payment obligations similar to those the Borrower Third Party Defendants undertook in the Credit Agreement.

50.     Defendant Gunzburg personally agreed to indemnify and hold harmless MidCap Funding IV Trust from "and guaranty payment of, any actual loss that [MidCap Funding IV Trust] may sustain as a result of any breach by [Mr. Gunzburg] of the foregoing warranties or certifications or any fraud, deceit or criminal action on the part of [Mr. Gunzburg] in his... dealings with [MidCap Funding IV Trust]."

51.     Defendant Gunzburg further agreed to pay to MidCap Funding IV Trust on demand any amounts misdirected from any Lockbox Account or paid out to any person in violation of the Credit Agreement and other financing documents and in connection with "any similar action of a Borrower or its officers, directors or employees."

## The Transfer of Operations and Redwood's Continued Failures

52.     In the fall of 2019, Third Party Defendants notified MidCap that the relevant operator Third Party Defendants intended to transfer operations to ELC.

53.     Despite numerous requests for information about the proposed transfer and plans to repay the MidCap Loan, Borrower Third Party Defendants did not provide MidCap with any documentation or information.

54.     However, MidCap continued to provide additional advances under the MidCap Loan to the Borrower Third Party Defendants to provide the critical working capital to pay for operating costs of the Facilities (including the provision of nursing home care) during the period leading up to the transfer of operations, and, consistent with prior practice and agreement, all

amounts deposited into the Lockbox Accounts continued to be swept on a daily basis to the MidCap Account to pay down the revolving MidCap Loan.

55.    Because those advances under the MidCap Loan were necessary to fund continued operations at the Facilities, the principal balance of the MidCap Loan owed by Borrower Third Party Defendants as of the Transfer Date was $4,106,646.76.

56.    Although Borrower Third Party Defendants desired to transfer operations of the Facilities to ELC, the reality was that they still owed MidCap a substantial amount of money and had created no plan or proposal to pay off the MidCap Loan.  Furthermore, Section 5.6 of the Credit Agreement expressly prohibited any transfer of the Facilities without the prior consent of MidCap, and MidCap had no obligation to release any of its first priority, perfected liens until such time as it was repaid all of the MidCap Loan obligations in full.

57.    Third Party Defendants never proposed any repayment plan to MidCap, but rather, upon information and belief, Borrower Third Party Defendants proceeded to transfer operation of the Facilities to ELC without obtaining MidCap's consent on or about the Transfer Date.  Further, although ELC had, upon information and belief, requested that Borrower Third Party Defendants obtain MidCap's release of its liens, MidCap never agreed to release its liens on Borrower Third Party Defendants' property, which included, among other things, the Lockbox Accounts and the Concentration Account, the cash in those deposit accounts, the accounts receivable payable to the Lockbox Accounts, the provider agreements giving rise to the accounts receivable, and all proceeds thereof.

58.    To the extent ELC and the Redwood entered into any agreement with regard to how funds for services rendered after the transfer of operations should be credited, MidCap was not a party to any such agreement.

4844-7091-1180

16

59.     Compounding the Borrower Third Party Defendants' failure to pay and honor the terms of the Credit Agreement, upon information and belief, at or around the time of the transfer and prior to, officers or employees of Borrower Third Party Defendants, overseen by Defendant Gunzburg, improperly directed the deposit of Accounts in an amount not less than $874,199.76 (the "Diverted Funds") to deposit accounts other than the Lockbox Accounts in violation of Section 2.11(a) of the Credit Agreement and the Certificate of Validity.

60.     This nearly $900,000 in Diverted Funds, of course, could have and, under the Credit Agreement should have, been held in trust for MidCap's use to pay down the Borrower Third Party Defendants' considerable outstanding balance on the MidCap Loan.  Instead, the Third Party Defendants, in violation of the Credit Agreement, the DACAs, the DARAs, and the Certificate of Validity, directed those funds away from MidCap.  As a result, the outstanding balance of the MidCap Loan on the Transfer Date and subsequent to the diversion of funds after the Transfer Date was substantially higher than it would have been, had such Diverted Funds been applied to reduce the MidCap Loan as proscribed by the loan documentation.

**The Payoff Letter, More Indemnification Obligations and Settling the Midcap Loan**

61.     Following the Transfer Date, and pursuant to the terms of the Credit Agreement, DACAs and DARAs, MidCap continued to receive collections in the MidCap Account and applied those collections to reduce the outstanding balance of the MidCap Loan until the balance was reduced to zero dollars on or about December 3, 2019.

62.     The funds that MidCap collected in the MidCap Account during this time were not clearly indicated as having been for services before or after the Transfer Date.  Rather, the money necessary to pay off Redwood's obligations was simply sent (or swept), in one daily wire payment

from Redwood's bank account to the MidCap Account through the operation of the same, standard transfer instructions that had been in place all along.

63.    After the outstanding balance had been reduced to zero dollars by application of funds as described above, Borrower Third Party Defendants requested, and MidCap provided, a customary payoff letter (the "Payoff Letter") in connection with the payoff of the MidCap Loan. MidCap Funding IV Trust and Borrower Third Party Defendants each executed the Payoff Letter as of December 3, 2019.

64.    The Payoff letter was executed, upon information and belief, by Defendant Gunzburg, on behalf of all twelve other Third Party Defendants.

65.    In the Payoff Letter, the Borrower Third Party Defendants assumed *additional* obligations to indemnify MidCap, and again agreed that the indemnification obligation would survive the MidCap loan payoff.

66.    In the Payoff Letter, the Borrower Third Party Defendants (once again) agreed to pay MidCap's losses, liabilities, fees, and expenses incurred in connection with the Payoff Letter and the Credit Agreement.

67.    Specifically, the Payoff Letter states:

Borrowers agree to reimburse and pay, within three (3) days of demand therefor, in immediately available funds, all losses, liabilities, charges, expenses and fees (i) which Agent may have incurred or may now or hereafter incur in connection with the transactions contemplated hereby which have not as yet been reflected in Borrower's loan account which Borrowers are, or may be, required to bear pursuant to the Financing Documents, (ii) which Agent, any Lender may incur as a result of errors in calculation of any amounts due to any such Person by Borrower, and (iii) any amounts that arise in respect of Surviving Obligations.

68.    With the Payoff Letter, the Third Party Defendants had agreed, now in a trio of agreements, to indemnify MidCap for its losses, fees, and expenses in connection with the Credit Agreement, the loan repayment protocols of that agreement, and the payoff of that agreement.

69.    In addition to the indemnification obligations established by the Payoff Letter, through that document the Borrower Third Party Defendants agreed that if MidCap was compelled to return or pay out monies that were credited to the Borrower Third Party Defendants' account, that amount would be reinstated and owed by Borrower Third Party Defendants to MidCap.

70.    Specifically, this reinstatement obligation provides:

… in the event any payment made to, or other amount or valued received by, [MidCap Funding IV Trust] from or for the account of Borrowers is avoided, rescinded, set aside or must otherwise by returned or repaid… the indebtedness intended to be repaid thereby shall be reinstated (without any further action by any party) and shall be enforceable    against Borrowers and their successors or assigns.  In such event, Borrowers shall be and remain liable… for the amount so repaid or recovered to the same  extent as if such amount had never originally been received by [MidCap Funding IV Trust] with interest accruing thereon from and after the date such amount is so repaid or recovered.

71.    The Payoff Letter is thus clear that, if MidCap is forced to pay out monies that Borrower Third Party Defendants were credited, then the Borrower Third Party Defendants do not get off scot-free; rather, they must pay the money to MidCap to satisfy their obligations.

## Recent Developments Including the ELC Lawsuit

72.    On August 3, 2020, Plaintiffs filed their lawsuit in this matter against Defendants MidCap Funding IV Trust and MidCap Financial Services, LLC.

73.    Plaintiffs claim that money that was deposited into the Lockbox Accounts, and then swept into the Concentration Account and then into the MidCap Account was payment for services rendered by the Plaintiffs and allege that MidCap is obligated to return those funds to Plaintiffs along with other damages.

74.    Defendants/Third Party Plaintiffs have filed an Answer in this litigation asserting that Plaintiffs are not entitled to any repayment from MidCap.

75.    In the event that the Court were to find that either or both of the MidCap Entities have any liability to Plaintiffs, any such liability, as well as the costs associated with litigating the

issues to conclusion, is owed by Third Party Defendants to MidCap given the conduct of the Third

Party Defendants and their assorted contractual obligations to the MidCap Entities and Plaintiffs.

## CLAIMS FOR RELIEF

### Count One - Contractual Indemnity (All Borrower Third Party Defendants) (Credit and Security Agreement and Payoff Letter)

76.     The foregoing allegations are incorporated as if fully restated herein.

77.     Through both the Credit Agreement and the Payoff Letter, the Borrower Third Party

Defendants voluntarily agreed to undertake indemnification obligations to MidCap.

78.     These indemnity obligations are clear, binding, and survived the payoff of the

MidCap Loan.

79.     These indemnity obligations require the Borrower Third Party Defendants to pay

MidCap for all costs, fees, expenses, and judgments, among other things, associated with any

litigation arising in connection with the Credit Agreement and Payoff Letter.

80.     As the ELC lawsuit stems from the payoff of the loans contemplated under the

Credit Agreement and a dispute about the funds used to pay off the loans contemplated under the

Credit Agreement, the ELC lawsuit is clearly connected to the Credit Agreement and Payoff Letter,

and thus the ELC lawsuit triggers the Borrower Third Party Defendants' indemnification

obligations.

81.     The Credit Agreement and Payoff Letter are valid contractual agreements between

one or more of the MidCap Entities and the Borrower Third Party Defendants.

82.     In consideration for MidCap loaning Borrower Third Party Defendants money and

servicing the MidCap Loan, both of these agreements provide that all Borrower Third Party

Defendants are jointly and severally obligated to indemnify one or both of the MidCap Entities for

any losses one or both might incur in connection with the Credit Agreement and the Payoff Letter and the related transactions.

83.    Notwithstanding the plain language of the relevant agreements, the Borrower Third Party Defendants have rejected and disclaimed any indemnification obligations in this matter.

84.    In light of the indemnification obligations, the Borrower Third Party Defendants are liable, and should be ordered to reimburse MidCap for any judgment against MidCap in the ELC lawsuit, as well as all fees, expenses and costs that MidCap is incurring in defending the ELC lawsuit as well as all such fees, expenses and costs that MidCap is incurring in bringing this claim.

## Count Two - Contractual Indemnity (Defendant Gunzburg)
### (Certificate of Validity)

85.    The foregoing allegations are incorporated as if fully restated herein.

86.    The Certificate of Validity is a valid contractual agreement between MidCap Funding IV Trust and Defendant Gunzburg.

87.    In the Certificate of Validity, Defendant Gunzburg expressly agreed to indemnify and hold harmless MidCap Funding IV Trust from "and guaranty payment of" any loss sustained by MidCap Funding IV Trust as a result of his breach of his agreement to abide by the Lockbox Account protocol provided for in the Credit Agreement or any fraud.  Defendant Gunzburg promised to personally indemnify MidCap Funding IV Trust for all losses, fees, judgments, and all other costs it incurred as the result of any diversion of funds from a Lockbox Account, which would include costs and potential judgment associated with the litigation brought by ELC.

88.    To date, Defendant Gunzburg has disclaimed any indemnification obligations in this matter.

89.    In light of the indemnification obligations in the Certificate of Validity, Defendant Gunzburg is personally liable to MidCap for any judgment against MidCap in the ELC lawsuit

(with specific liability to be determined by the Court at the trial of this matter), as well as all fees, expenses and costs that MidCap is incurring in defending the ELC lawsuit as well as all such fees, expenses and costs that MidCap is incurring in bringing this claim.

### Count Three - Breach of Contract (Borrower Third Party Defendants)

90. The foregoing allegations are incorporated as if fully restated herein.

91. The Credit Agreement creates binding obligations on the part of the Borrower Third Party Defendants to repay MidCap Funding IV Trust for its loans to the Borrower Third Party Defendants.

92. To ensure prompt repayment, the Credit Agreement provides that the Borrower Third Party Defendants will establish a Lockbox Account, into which **all** Accounts, which is broadly defined to include all monies owing to Borrower Third Party Defendants, are required to be deposited. This essential provision of the Credit Agreement further provides that the Borrower Third Party Defendants will not redirect such Accounts to any deposit account or other destination other than the appropriate Lockbox Account.

93. Without the consent of the MidCap Entities, and in violation of the provisions of the Credit Agreement, the Borrower Third Party Defendants in fact improperly diverted approximately $875,000 to non-Lockbox Accounts they controlled.

94. This diversion prevented the MidCap Entities from being able to credit the Diverted Funds to the repayment of the MidCap Loan.

95. The Plaintiffs claim that the MidCap Entities have credited funds to the MidCap Loan that belong to ELC. If true, at least $875,000 of the amount at issue is at issue only because the Borrower Third Party Defendants breached the Credit Agreement and diverted funds that would have otherwise been used to pay down the MidCap Loan.

96.     Thus, to the extent the Court determines that either or both of the MidCap Entities have liability to ELC, such liability arises, at least in part, from the Borrower Third Party Defendants' breach of the Credit Agreement in this regard, and the Borrower Third Party Defendants are responsible for MidCap's damages, losses, expenses, fees, and costs of that breach in an amount to be determined at trial.

## Count Four - Breach of Contract (Defendant Gunzburg)

97.     The foregoing allegations are incorporated as if fully restated herein.

98.     In the Certificate of Validity, Defendant Gunzburg agreed not to take any action, or allow any action to be taken, that would impede or interfere with the deposit of all Accounts to the Lockbox Accounts.  Specifically, he agreed that he would not direct or "suffer to occur" any diversion of any payment from any Lockbox Account in violation of the Credit Agreement.

99.     Mr. Gunzburg specifically agreed to pay to MidCap Funding IV Trust on demand any amounts misdirected from any Lockbox Account or paid out to any person in violation of the Credit Agreement and other financing documents and in connection with "any similar action of a Borrower or its officers, directors or employees."

100.    The MidCap Entities have advised Mr. Gunzburg of the improper diversion of funds and the potential losses associated with the ELC litigation and have demanded payment. Such demand has been rebuffed by Mr. Gunzburg through counsel.

101.    MidCap has been damaged by Defendant Gunzburg's conduct in an amount to be determined at trial of all claims in this case and Defendant Gunzburg is personally liable for that damage under the terms of the Certificate of Validity.

## Count Five - Breach of Contract (All Borrower Third Party Defendants)

102.    The foregoing allegations are incorporated as if fully restated herein.

103.     Per the Payoff Letter, which is a valid and enforceable agreement between the parties, if the Court were to find that MidCap was required to remit any money to ELC that sum would be reinstated as a balance owed by the Borrower Third Party Defendants.

104.     Further, to the extent the Court were to find that the MidCap Entities have any liability to ELC, any damages and losses sustained by the MidCap Entities would flow from the failure of the Borrower Third Party Defendants to pay amounts owed under the Credit Agreement. If the Third Party Defendants had not diverted funds in violation of the very clear and specific requirements of the Credit Agreement, the DACAs, the DARAs, and Certificate of Validity, the MidCap Entities would not have applied at least some portion of the monies at issue in the primary ELC lawsuit to the MidCap Loan, and would have instead returned those funds to the Borrower Defendants, who could have paid them to ELC per the terms of their agreement(s).

105.     If MidCap is compelled to return any money to ELC, it would be money that MidCap used to pay off the Third Party Defendants' liability to MidCap. If MidCap had not received that money or is now compelled to return it, the Third Party Defendants would have an outstanding balance to Midcap on the MidCap Loan, and would be in breach upon their refusal to pay it under the terms of the Credit Agreement and the Payoff Letter.

## Count Six - Conversion (All Third Party Defendants)

106.     The foregoing allegations are incorporated as if fully restated herein.

107.     The funds diverted by the Third Party Defendants rightfully belonged to MidCap under the provisions of the Credit Agreement and related agreements, and MidCap had legal title to and the right to immediate possession of all such funds.  To be clear, MidCap Funding IV Trust had already loaned funds to Borrower Third Party Defendants for their operations and their provision of critical care, and the Diverted Funds were contractually mandated to be delivered to

MidCap to pay down the MidCap Loan. By using the Diverted Funds, even to pay other expenses, Borrower Third Party Defendants obtained both the money MidCap loaned to the Third Party Defendants and the money intended to be paid MidCap for repayment of the MidCap Loan.

108.    MidCap had the right to possess the Diverted Funds at the time Third Party Defendants converted those funds.

109.    By altering the transfer instructions in a manner inconsistent with the terms of the Credit Agreement and related documents, the Third Party Defendants obtained the Diverted Funds (to which they were not entitled) and exercised dominion over that property in a manner was to the Third Party Defendants' own use and beneficial enjoyment while denying MidCap the right to use and enjoy that property to which it was entitled.

110.    Through the intentional diversion of funds, Third Party Defendants intended to interfere with MidCap's possession of those funds despite MidCap's clear entitlement to their receipt.

111.    MidCap has made demand of the Third Party Defendants for the return of the Diverted Funds, so that they can be held in trust pending the outcome of the ELC lawsuit. Third Party Defendants have rebuffed this request through counsel.

112.    Third Party Defendants' intentional diversion of funds was the sole, proximate and legal cause of MidCap's loss of the Diverted Funds.

113.    MidCap has been damaged as a result of Third Party Defendants' improper misdirection of the Diverted Funds. Third-Party Defendants' conversion has increased MidCap's potential liability to ELC and all fees and costs so associated as stated above. Specifically, if the Third Party Defendants had not diverted funds in violation of the very clear and specific requirements of the Credit Agreement, the DACAs, the DARAs, and Certificate of Validity, the

MidCap Entities would not have applied at least some portion of the monies at issue in the primary ELC lawsuit to the MidCap Loan, and would have instead returned those funds to the Borrower Defendants, who could have paid them to ELC per the terms of their agreement(s).

114.     Accordingly, MidCap Entities seek a judgment against the Third Party Defendants in any amount that MidCap is found to be liable to Plaintiffs, along with MidCap's fees, costs, and expenses associated with this litigation.

WHEREFORE, Third Party Plaintiffs prays as follows:

A.     That the Court entry of an order and judgment in their favor and against Third Party Defendants on all Counts herein;

B.      Entry of an Order and Judgement ordering Third Party Defendants to pay to Third Party Plaintiffs an award of compensatory damages equal to the total amount of all money that MidCap is ordered to pay to ELC, if any, along with all of MidCap's fees, costs, and expenses associated with this lawsuit, along with pre- and post-judgment interest.

C.     Any and all other relief to which MidCap may appear entitled.

Dated:  September 22, 2020.

Respectfully submitted,

/s/ Andrew A. Warth

Stanley E. Graham (KY Bar No. 95865)
Kathleen G. Stenberg (TN Bar No. 022301)(*pro hac vice*)
Andrew A. Warth (TN Bar No. 027606)(*pro hac vice*)
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Telephone: (615) 244-6380
Facsimile: (615) 244-6804
Email: drew.warth@wallerlaw.com
Email: stan.graham@wallerlaw.com
Email: katie.stenberg@wallerlaw.com

*Attorneys for Defendants/Third Party Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

Albert F. Grasch , Jr.
J. Wesley Harned
James L. Thomerson
Rose Grasch Camenisch Mains PLLC
326 S. Broadway
Lexington, KY 40508
859-721-2100
Fax: 859-523-3857
Email: al.grasch@rgcmlaw.com
Email: wes.harned@rgcmlaw.com
Email: jim.thomerson@rgcmlaw.com

/s/ Andrew A. Warth
*Attorneys for Defendants/Third Party Plaintiff*