UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

|  |  |  |
|---|---|---|
| FRANKFORT REHAB AND CARE, LLC, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 3:20-cv-00059-GFVT |
| V. | ) ) | **MEMORANDUM** |
| MIDCAP FUNDING IV TRUST, *et al.*, | ) ) | **OPINION** **&** |
| Defendants. | ) ) ) | **ORDER** |

*** *** *** ***

This matter is before the Court on Plaintiffs' Motion to Strike, or, Alternatively to Sever

Defendants' third-party claims. [R. 53.] For the following reasons, the motion is **GRANTED**.

**I**

Prior to November 1, 2019, Frankfort Leasing, LLC, Vanceburg Leasing, LLC, Stanford

Leasing, LLC, St. Matthews Leasing, LLC, Mt. Holly Leasing, LLC, Hillcreek Leasing, LLC,

Greenhill Leasing, LLC, and Camelot Leasing, LLC each individually operated long-term care

facilities in Kentucky. During this time, these facilities were owned and controlled by Redwood

Holdings, LLC. [R. 1 at 6.]

To finance operations at the facilities, Redwood entered into a Credit Agreement with

Midcap Funding IV Trust that provided Redwood with an $8,000,000 revolving line of credit.

[R. 62 at 4.] In consideration, Redwood granted Midcap a "perfected security interest" in all of

its assets including "the payments from Payors, including specifically, governmental Payors,

such as Medicare and Medicaid." [*Id.*] Redwood established several Lockbox Accounts to

collect the Payor's remitted payments.  All deposited amounts were automatically transferred to Midcap daily to reduce Redwood's outstanding loan balance.  [*Id*. at 5.]  To execute the Credit Agreement, Midcap filed twelve UCC-1 financing statements with the office of the Kentucky or Ohio Secretaries of State, as applicable.  [*Id*.]

On October 31, Plaintiffs (collectively Exceptional Living Centers or "ELC") and Redwood entered into an Operations Transfer Agreement under which ELC acquired the right to operate the facilities, effective November 1.  [R. 1 at 6.]  The agreement held that all revenues relating to services provided at the Facilities after November 1 were the property of ELC and that if any such revenues came into the possession of Redwood, they would be promptly transferred, or until being transferred, they would be held in trust.  [*Id*.]  Kentucky Medicare payments were included in those "revenues."  [*Id*. at 8.]

Plaintiffs assert that because the transfers of Medicaid agreements in Kentucky can take several months, ELC used Redwood's existing Medicaid account numbers for billing until new numbers could be issued.  [*Id*.]  ELC and Redwood sent hardship letters to the Kentucky Department for Medicaid Services that detailed the situation and requested the above payment method.  [R. 1-1.]  This payment method was followed, and two Medicare payments were delivered into Redwood's account on November 14 and 21 for $595,017.45 and $621,440.79, respectively.  [*Id*. at 11.]

On October 25, prior to ELC's purchase of the Facilities' Operations and in preparation for a potential transfer, ELC, represented by its manager, Tom Watts, telephoned the Managing Director of Portfolio Management and Operations at Midcap, Brett Robinson, to clarify the situation.  [*Id*. at 8.]  ELC asserts that Mr. Robinson assured Mr. Watts that Midcap "would not hold his money" from the lockbox account because Midcap "could not take what didn't belong

to them." [*Id*.]  Midcap holds that these alleged representations by Mr. Robinson could not be

relied upon by Counsel for ELC.  [R. 62 at 13.]  Counsel for Redwood sent further notice

through email alerting Midcap that all revenues from Medicare payments generated after

November 1 were the property of ELC.  [R. 1 at 9.]  Midcap holds that the transfer of operations

was done without their consent or acknowledgment.  [R. 62 at 10.]

On December 2, counsel for ELC sent Midcap a letter demanding that "Midcap not use or

apply the . . . November 14 and 21, 2019 payments or any other payments earned by Plaintiffs

for serviced rendered at the Facilities on an after November 1, 2019 to pay down . . . Redwood's

indebtedness under the Midcap loan."  [R. 1 at 11–12.]  ELC asserts that on December 3, Midcap

applied these payments to pay off the entire amount of Redwood's indebtedness under their loan.

[*Id*.]

ELC filed their Complaint on August 3, 2020.  ELC demands (1) a trial by jury; (2) entry

of judgment in its favor on the counts of declaratory judgment, conversion, fraud, negligent

misrepresentation, and constructive trust; (3) an award against Midcap of compensatory damages

equal to the total amount of post-transfer payments received into Redwood's lockbox account at

Fifth Third Bank and applied to Redwood's indebtedness in its Midcap loan; (4) an award of

punitive damages against Midcap; (5) an award to ELC of its reasonable attorney fees, costs and

expenses incurred in connection with this litigation; (6) an award to ELC of pre- and post-

judgment interest; and (7) any and all other relief to which it may be entitled.  [*Id*. at 21–22.]

In response to ELC's complaint, Midcap submitted a six-count third-party complaint

seeking indemnity and contribution from third-party Defendants Redwood and its former

president, Eli Gunzburg.  [R. 53 at 9.]  This complaint brings indemnity claims against third-

party Defendants based upon provisions within the Credit Agreement, Payoff Letter, and

Certificate of Validity.  The Plaintiffs have filed a Motion to Strike, or Alternatively, to Sever these claims.  [R. 53.]

## II

Rule 14 of the Federal Rules of Civil Procedure governs third-party practice, also known as "impleader," or a defendant's right to bring a complaint on a nonparty "who is or may be liable to it for all or part of the claim against it."  Fed. R. Civ. P. 14.  The purpose of Rule 14 is to "encourage judicial economy by permitting courts to dispose of multiple claims which arise out of the same facts."  *Tate v. Frey*, 735 F.2d 986, 989 (6th Cir. 1984).

The right to third-party practice "is not automatic, and district courts have broad discretion in determining whether to permit impleader."  *Navigators Ins. Co. V. Univ. Of Louisville Found., Inc.*, 329 F.R.D. 557, 560 (W.D. Ky. 2019) (citing *Ohio Farmers Ins. Co. V. Special Coatings, LLC*, 2008 WL 5378079, at *13 (M.D. Tenn. Dec. 23, 2008)).  In its discretion, district courts can strike a third-party claim "if it is obviously unmeritorious and can only delay or prejudice the disposition of the plaintiff's claim."  Fed. R. Civ. P. 14 advisory committee's note to 1963 amendment.  District courts also have "broad discretion" in deciding whether to sever a third-party claim under Rule 14(a)(4).  *Papineau v. Brake Supply Company, Inc.*, 2021 WL 1881650 *2 (W.D. Ky. 2021); *Parchman v. SLM Corp.*, 896 F.3d 728, 733 (6th Cir. 2018).

In *American Zurich Ins. v. Cooper Tire & Rubber Co.*, the Sixth Circuit held that third-party pleading is appropriate "only where the third-party defendant's liability to the third-party plaintiff is dependent; one that merely arises out of the same set of facts does not allow a third-party defendant to be impleaded."  512 F.3d 800, 805 (2008).  Therefore, the "essential criterion of a third-party claim" is a defendant's transfer of the "liability asserted against him by the original plaintiff to the third-party defendant."  *Id*; *see also Gookin v. Altus Ptnrs.*, 2006 WL

7132020 at *3 (E.D. Ky. Mar. 24, 2008) ("Liability is derivative where it is dependent on the determination of liability in the original action.")

The purpose of this order is not to rule on the liability of the Defendants. Instead, the Court must decide whether the third-party complaint effectively transfers the liability asserted against Midcap to the third-party Defendants Redwood and its former president, Eli Gunzburg. This decision turns on the nature of the contractual provisions cited by Midcap. Construing these provision requires an understanding of security interests generally and health care receivables specifically.

**A**

A secured party typically "has control of a deposit account if: (1) the secured party is the bank with which the deposit account is maintained; (2) the debtor, secured party, and bank have agreed in an authenticated record that the bank will comply with instructions originated by the secured party directing disposition of the funds in the deposit account without further consent by the debtor; or (3) the secured party becomes the bank's customer with respect to the deposit account." UCC § 9-104. Control is necessary to perfect a security interest and is realized upon attachment of a proper filing statement. U.C.C. § 9-203 (2001); U.C.C. § 9-309 cmt. 5 (2001).

The anti-assignment provisions for Medicare Part A, including skilled nursing facilities, state that a Medicare payment owing to a provider cannot be made "to any other person under an assignment or power of attorney." 42 U.S.C. § 1395g(c). In this regard, Medicare health-care insurance receivables are atypical in that the debtor retains the right to direct the funds within the deposit account. *See* 42 C.F.R. § 424.73(b)(v) (2004). The secured party lacks control, and therefore lacks the ability to exercise remedies associated with a perfected security interest. *See id*. By way of preemption, the anti-assignment provisions (federal law) supplant the rights

typically afforded to lenders under the UCC (representing state law).  *See* Kimberly E. Zirkle, *Not So Perfect: The Disconnect Between Medicare and the Uniform Commercial Code Regarding Health-Care-Insurance Receivables*, 9 N.C. Banking Inst. 373, 380 (2005); *see also* U.C.C. § 9-310 (governing perfection of a security interest by filing a financing statement); § 9312 (governing perfection of security interests in deposit accounts); § 9-314 (defining perfection by control); § 9-315 (governing security interest attachment in identifiable cash proceeds); § 9-408 (detailing restrictions on assignments of health-care insurance receivables); § 9-607 (establishing collection and enforcement remedies available to secured parties) (2001).

Nevertheless, loans to healthcare providers, secured by Medicare receivables, have been found to be "straightforward collateral arrangements."  *Locke Realty Corp. IX v. U.S. Health, LP*, 2007 WL 724750 at *1 (N.D. In. 2007) (citing *Credit Recovery Systems, LLC v. Heike*, 158 F.Supp.2d 689, 693 (E.D.Va. 2001)).  The Seventh Circuit in *DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc*., held that the anti-assignment statute prohibits Medicare funds "paid directly by the government to someone other than the provider, but it does not prohibit a third party from receiving Medicare funds if they first flow through the provider." 384 F.3d 338, 350 (7th Cir. 2004).

A secured lender involved in such a loan remains unable to treat security interests in health care receivables as they would other perfected interests.  In order to mitigate these risks and comply with the anti-assignment provisions, lenders and providers (providers of health care, also the debtor in relation to the lender) typically agree to a governmental depository arrangement whereby the provider agrees to sweep all funds received in the governmental lockbox to another account "subject to the control of the lender."  Zirkle, *supra*, at 381; *see also* Mary H. Rose, *What the Medicare, Medicaid Anti-Assignment Provisions Really Mean,* 34 Am.

6

Bankr. Inst. J. 26, 26 (2015).   To comply with the anti-assignment provision, these arrangements must allow the provider to rescind the sweep.  *Id.*

While providers have broad authority over healthcare receivables, there is a strong presumption against their right to assign these claims to non-providers.  In *Heike*, a lender attempted to sell the rights to healthcare receivables after a former provider defaulted on its loan. 158 F. Supp.2d at 694.  There, the *Heike* Court declined to comment on whether providers can assign away their right to receive healthcare receivables to a non-provider; however, it made clear that the statute on healthcare receivables "creates a strong presumption against assignment." *Id.* (citing § 1395g(c)).  Following the language of the anti-assignment statute, the *Heike* Court ruled that direct Medicare payments to a non-provider were permitted only after an amended security agreement with a provider had been "established by, pursuant to, or in accordance with an order from a court of competent jurisdiction." *Id.*; *see also Locke Realty Corp. IX*, at *3.  If the debtor and secured lender enter an arrangement that runs contrary to the language of the anti-assignment statute, the provider agreement between Medicare and the health care provider may be terminated.  42 C.F.R. § 424.74 (2004).

Midcap referred to its interest in Redwood's governmental lockbox account as a "first priority, properly perfected security interest."  [R. 62 at 4.]  This interest was included in the Credit Agreement and was executed when Midcap filed twelve UCC-1 financing statement with the offices of the Kentucky or Ohio Secretaries of State, as applicable.  [*Id.* at 5.]  If this was a non-Medicare health insurance receivable, this interest would be perfected upon these filings and Midcap would have control.  However, the governmental lockbox received payments directly from Medicare and was thus subject to the anti-assignment statute.  Accordingly, Redwood had the ultimate control over Medicare payments sent to the account.

7

While this arrangement is atypical for a security interest used by a lender as collateral, Midcap had every right to include it among the assets in the Credit Agreement.  Midcap was aware of the risk using healthcare receivables as collateral brings and applied the "industry standard" lockbox arrangement to mitigate.  [*Id.*]  This standard arrangement involved the daily "sweep" of all payments received by the lockbox into an account subject to Midcap's control.  [*Id.*]

As the provider of the health care for which Medicare payments were received, Redwood had control over the deposits into the account and could decide to rescind all sweeps over it at any time.  There is a question of whether control over the lockbox was released in the Credit Agreement or not.  If control was *not* released, Redwood effectively rescinded the sweep in its November 1, 2019 letter to Midcap.  As a result, Midcap would have no right to continue the sweep and apply the November 14 and 21 deposits into the lockbox account to Redwood's indebtedness on the loan.  If control over deposits *was* released by Redwood, the absence of an order from a court of competent jurisdiction would nullify Redwood's assignment of its rights to Midcap.

**B**

Third-party complaints include indemnity and contribution claims.  *Mitchell v. Carhartt, Inc.*, 2016 WL 1532255 at *2 (W.D. Ky. Apr. 14, 2016); *see e.g. American Zurich*, 512 F.3d at 805.  These actions need not be "express indemnity or contribution claim[s]."  *Budsgunshop.com LLC v. Sec. Safe Outlet, Inc.*, 2012 WL 1899851 at *7 (E.D. Ky. May 23, 2012).  However, they are only permissible if they are "in the nature" of an indemnity claim.  *Id*.

Under Kentucky law, "the right to contribution arises when two or more joint tortfeasors are guilty of concurrent negligence of substantially the same character which converges to cause

8

the plaintiff's damages." *Acree v. Tyson Bearing Co.*, 2002 WL 463263 at *3 (W.D. Ky. Jan. 17, 2002) (quoting *Deneger v. Hall Contracting Corp.*, 27 S.W.3d 775, 778 (KY 2000)). The right to indemnity "is available to one exposed to liability because of the wrongful act of another" but who is not equally at fault with the wrongdoer. *Id*. at 780. The Sixth Circuit in *Thompson v. The Budd Co*., labeled claims arising from this right as "Common Law Indemnity Claims." F.3d 799, 806 (6th Cir. 2008).

Contractual indemnity claims provide third-party plaintiffs another opportunity to transfer liability. Kentucky law provides that "the nature of an indemnitor's liability under an indemnity contract shall be determined by the provisions of the indemnity agreement itself." *Id.* at 807 (citing *United States Fidelity & Guar. Co.* v. *Napier Elec. & Const. Co*., 571 S.W.2d 644, 646 (Ky. Ct. App. 1978)). Parties to the contract are permitted to provide indemnification provisions for "the costs incident to potential legal liability as well as for the legal liability itself." *Napier*, 571 S.W.2d at 646. These contractual provisions "should not be construed to permit an indemnitee to recover for his own negligence unless the court is firmly convinced that such an interpretation reflects the intention of the parties." *United States v. Seckinger*, 397 U.S. 203, 211 (1970).

In the present case, ELC's motion to strike Midcap's third-party claims is persuasive. Midcap relies on provisions within the Credit Agreement, Payoff letter, and Certificate of Validity; however, these provisions fail to produce valid contractual indemnity and contribution claims against the third-party Defendants Redwood and Eli Gunzburg.

While ELC and Midcap disagree on whether the third-party claims are "in the nature" of an indemnity claim, such a finding is immaterial because the Court will decide the present issue

on other grounds.  Accordingly, this Order will continue under the assumption that each claim within Midcap's third-party complaint passes this standard.

Midcap seek indemnity and contribution arising from breaches of the Credit Agreement, Payoff Letter, and Certificate of Validity.  These contractual indemnity and contribution claims will be analyzed in turn as they appear in the six counts.

**1**

Count One relies on the express indemnity provisions of the Credit Agreement and Payoff Letter. The express indemnity provision of the Credit Agreement relied upon by Midcap holds Redwood accountable for:

> any and all liabilities, obligations, [etc.] . . . in connection with any . . . judicial matter or proceeding . . . in connection with the transactions contemplated hereby . . .  except that Borrower shall have no obligation hereunder to [Midcap] with respect to any liability resulting from the gross negligence or willful misconduct of [Midcap]."

[Credit Agreement ¶ 38.]  ELC claims that the actions of Midcap constitute "gross negligence or willful misconduct."  [R. 53 at 15.]  This argument is compelling.  Midcap identifies the lockbox arrangement as "the appropriate manner by which the lender properly perfects its security interest."  [R.62 at 5.]  This shows its awareness of relevant law and standard practice within their industry.   As such, a reasonable entity is expected to follow § 1395g(c) and, as discussed previously, there is a strong presumption against assignment of direct Medicare payments to a non-provider.  *Heike*, 158 F.Supp.2d at 694.  If there is any liability resulting from the Medicare payments collected by Midcap, it is presumably the result of Midcap's negligence.  As a result, this contractual provision is likely unenforceable.

The Payoff Letter offers another express indemnity provision.  Midcap defines the obligations of this letter as an assurance that Redwood would pay back any monies that it was

credited should Midcap be forced to pay that money back out. [*Id.*] This assurance came by way of an agreement that Redwood "reimburse and pay . . . all losses, liabilities, charges, expenses, and fees" that Midcap may incur "in connections with the transactions contemplated hereby." [R. 62 at 11.] Midcap asserts that these "losses, liabilities, charges, expenses, and fees" include the liability ELC alleges against Midcap. [*Id.* at 12.] Following the Court's analysis in Count One, this alleged liability is presumably the result of Midcap's own negligence. As a result, the contractual provision relied upon in Count Two is likely unenforceable.

Midcap argues that Redwood "absolutely knew" that its loan was paid off using the funds due to ELC when it signed the Payoff Letter. [R. 62 at 11.] While this claim may have merit, it fails to change the language of the contract.

## 2

Count Two relies on the Certificate of Validity's "Hold Harmless Clause." The Certificate of Validity was executed by third-party Defendant Eli Gunzburg. In it, he agreed to hold Midcap harmless from "and guaranty payment of, any actual loss that [Midcap] may sustain as a result of any breach by [Gunzburg] of the foregoing warranties or certifications or any fraud, deceit or criminal action on the part of [Gunzburg] in his . . . dealings with [Midcap]." [*Id.* at 13.] The breach of lockbox protocol cited by Midcap is a diversion of funds, which includes "costs and potential judgment associated with the litigation brought by ELC." [*Id.* at 19.] The anti-assignment statute provided Redwood with the exclusive right to control deposits into and out of the account. Lockbox protocol restricting Redwood's right to divert the funds thus runs contrary to the unambiguous language of the statute. Even if this right was forfeited by Redwood in the Credit Agreement, there was no order from a court of competent jurisdiction that

approved.  *Heike*, 158 F.Supp.2d, at 693.  As a result, this contractual provision is likely unenforceable and thus cannot result in a valid indemnity claim.

3

Counts Three and Five pin Redwood's liability on its failure to comply with the Credit Agreement.  Count Three references improper diversion of funds as a breach of the Credit Agreement.  [R. 53 at 12.]  Similar to Count Two, this restriction on Redwood's right to divert funds runs contrary to the anti-assignment statute.  Accordingly, this contractual provision is likely unenforceable and thus fails to meet the standards of Rule 14.

Count Five states, "to the extent the Court were to find that the MidCap Entities have any liability to ELC, any damages and losses sustained by the Midcap Entities would flow from the failure of the Borrower Third Party Defendants to pay amounts owed under the Credit Agreement."  [R. 24 at ¶104.]   These amounts owed by Redwood would presumably include amounts that it failed to pay before the operations transfer with ELC.  While Redwood may be liable to Midcap for these pre-transfer amounts, that liability is independent of the determination of liability in the original action.  Therefore, Midcap fails to transfer the liability asserted against it by ELC and thus fails to meet the "essential criterion" of impleader.  *American Zurich Ins.*, 512 F.3d at 805.

4

Counts Four and Six seek contribution from Redwood. Count Four cites a provision within the Certificate of Validity in which Defendant Gunzburg agreed to "not direct or 'suffer to occur' any diversion of payment" from the lockbox account.  [R. 62 at 21.]  This limits Redwood's right to divert funds and is similar to the contractual provisions found in Counts Two

12

and Three.  As a result, it runs contrary to the anti-assignment statute and is likely unenforceable.
See 42 U.S.C. § 1395g(c).

Count Six is a conversion claim seeking contribution from Redwood and Gunzburg.
Midcap claims that "at least some portion" of what is owed to ELC could have been avoided if
"[Redwood and Gunzburg] had not diverted funds in violation" of the loan documents.  [*Id*. at
21.]  Like Count Five, Midcap's "if they would have done this, I never would have done that"
logic fails to transfer liability onto Redwood and Gunzburg.

### III

Following the Federal Rules of Civil Procedure advisory committee's notes, the Court
has discretion to strike Defendants' third-party complaint from this action if it makes
unmeritorious claims that can only delay or prejudice the initial claim brought by Plaintiffs.
Counts One through Four rely on contractual provisions that are likely unenforceable.  Counts
Five and Six consist of claims that seek contribution based on third-party Defendants' liability in
separate actions.  All Counts fail to transfer the liability asserted against Midcap by ELC onto
Redwood and Gunzburg and are thus improper under Rule 14(a) in the present action.  As a
result, the Court will strike the third-party complaint upon ELC's motion.  As an additional
consequence, the third-party Defendants' Motion to Strike the introduction to the third-party
complaint under Rule 12(f) [R. 59] is therefore moot. Accordingly, and the Court being
sufficiently advised, it is hereby **ORDERED** as follows:

1. Plaintiffs' Motion to Strike [**R. 53**] is **GRANTED**;

2. The Clerk of Court is directed to **TERMINATE** the third-party claims and parties from
   the docket; and

3.  The Third-party Defendants' Motion to Strike [**R. 59**] is **DENIED** as moot.


This the 22nd day of September, 2021.


Gregory F. Van Tatenhove
United States District Judge

14